UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| In re: | Case No. 13 B 29618 |
| SAM JUMA, | |
| Debtor. | Chapter 7 |
| R&J CONSTRUCTION SUPPLY CO., INC. n/k/a CCS CONTRACTOR EQUIPMENT & SUPPLY, INC., | Adv. No. 14 A 80 |
| Plaintiff, | |
| v. | |
| SAM JUMA, | Judge Pamela S. Hollis |
| Defendant. | |

**MEMORANDUM OPINION**

This matter comes before the court following trial on the complaint brought by R&J Construction Supply Co., Inc., now known as CCS Contractor Equipment & Supply, Inc. ("Supply"), against Sam Juma. Supply sought a finding that Juma's debt is nondischargeable pursuant to 11 U.S.C. § 523(a)(6).[1]

Juma brought a motion in limine seeking to bar Supply from introducing a state court order that contained a finding of "malice." Therefore, the court first held an evidentiary hearing to determine whether Juma was collaterally estopped from relitigating the question of malice.

---

[1] Technically this complaint is brought under 11 U.S.C. § 523(a)(3)(B), since Supply did not have notice or actual knowledge of the bankruptcy case in time to bring a complaint under § 523(a)(6). Although complaints seeking a finding that a debt is nondischargeable under § 523(a)(6) must generally be filed "no later than 60 days after the first date set for the meeting of creditors," Fed. R. Bankr. P. 4007(c), "[t]he penalty to debtor for failure to schedule such debts is not nondischargeability but instead it is loss of the 60-day limitation period." In re Amari, 483 B.R. 836, 843 (Bankr. N.D. Ill. 2012).

1

After orally granting the motion in limine and determining that collateral estoppel did not apply – a decision that is explained in more detail herein – the court held a trial on January 29, 2015.

Having heard the testimony of witnesses and reviewed the exhibits, the court finds that Supply did not meet its burden of proving by a preponderance of the evidence that Juma's debt was incurred by willful and malicious injury. Therefore, judgment will be entered in Juma's favor and his debt to Supply will not be excepted from discharge.

## BACKGROUND

This case dates back to 2005, when Sam Juma met Daniel Vaughan through Juma's father-in-law. Vaughan was a general contractor for whom Juma's father-in-law worked. Tr. Vol. 2 at 108. Juma "felt they had a good relationship going on . . . It was within the family." Tr. Vol. 2 at 111, lines 13-16.

Vaughan, in his late 30s or early 40s, approached the much-younger Juma with an idea that they "would partner up and build brand-new construction. I would take care of financing, and [Vaughan] would take care of the general contractor work that needs to be done." Tr. Vol. 2 at 110, lines 10-13.

The two men teamed up to build on Vaughan's vacant lot at 4401 West 53rd Street, Chicago, Illinois. Tr. Vol. 1 at 14; Tr. Vol. 2 at 17. Juma formed a corporation named Sam's Construction, and he stored all corporate records and invoices at Vaughan's house. Tr. Vol. 2 at 12, 15, 114. The mailing address for the corporation was 6512 West 63rd Street, Chicago, Illinois. Tr. Vol. 2 at 22. Juma owned the 63rd Street property and rented it to his parents. Tr. Vol. 1 at 23.

Vaughan transferred ownership of the construction site on 53rd Street to Juma "so [Juma] could get a construction loan to build the property." Tr. Vol. 2 at 17, lines 24-25. The business

partners planned to build a two-flat and then "[a]fter everything was paid back to the bank, me and Daniel Vaughn [sic] would split it 50/50." Tr. Vol. 2 at 21, lines 7-8.

Juma had absolutely no experience in the construction of new residential property, and Vaughan acted as the day-to-day manager of the project. Tr. Vol. 2 at 112. Juma was employed as a truck driver. Tr. Vol. 2 at 25. He worked the night shift Monday through Friday, so was only able to visit the construction project once or twice a week. Tr. Vol. 2 at 107, 112.

Juma did not place any orders for the materials needed for the project. "Danny would do the ordering, but if he had to get any financing or any credit applications, he would give that to me and I would take care of that part." Tr. Vol. 2 at 112, lines 14-17. Vaughan chose the vendors, who were supposed to be paid through a draw on the construction loan. Tr. Vol. 2 at 113. In the end, none of the vendors were paid in full. Tr. Vol. 2 at 114-15.

Juma filled out an application and submitted it to Supply in August 2005 in order to obtain credit. Tr. Vol. 2 at 30; Pl. Ex. 2 at 0284. Vaughan told him to do this because "he needed some equipment to construct the property for the second phase that he was working on." Tr. Vol. 2 at 34, lines 8-9. Juma neither knew nor understood that the purpose of the application was to rent concrete forms. Tr. Vol. 2 at 43.

On or about August 9, 2005, Vaughan signed the delivery ticket for the forms; he was at the construction site when the forms were delivered. Tr. Vol. 2 at 100-102; Pl. Ex. 10. Later some invoices regarding the forms were mailed to Juma, but until he started receiving calls "about debts owed and the forms needed to be returned," Juma never read those invoices. Tr. Vol. 2 at 44, lines 16-17. Before then, Juma had no idea that forms would be needed to pour the cement foundation. "I did not have a clue that I needed forms. I didn't even know what forms are, sir." Tr. Vol. 2 at 28, lines 10-11.

3

Representatives from Supply started calling Juma, demanding that the rental forms and other equipment be returned. Tr. Vol. 2 at 46. Juma knew the forms had been delivered to the construction site, but he never saw them there, Tr. Vol. 2 at 69, and didn't know what happened to them. Tr. Vol. 2 at 48-49, 52, 58, 68.

Leigh Hamm of Supply sent Juma a demand letter on December 6, 2005. Tr. Vol. 2 at 95; Pl. Ex. 1. Juma never responded. Tr. Vol. 2 at 56-57; 96. "I was trying to resolve it between me and my partner and get the forms back to R&J Construction." Tr. Vol. 2 at 62, lines 11-13.

Juma asked Vaughan "multiple times" what happened to the forms. Tr. Vol. 2 at 60, line 4. Vaughan told Juma he'd "take care of it." Id. at line 6.

Q:  How did you follow up or did you follow up?

A:  I did follow up, phone calls. I tried to set up a meeting with him [Vaughan] to talk to him in person face to face, and I was successful a couple of times. But every time was I'll take care of it, I'll take care of it, and –

Q:  And it was never taken care of?

A:  No, it was not.

Tr. Vol. 2 at 67, line 21 – page 68, line 3.

"I tried to get a location. I couldn't. I wasn't able to obtain a location to be able to pin them and to be able to call R&J Construction Company to come out." Tr. Vol. 2 at 60, lines 11-14. Vaughan eventually left for Ireland, and although Juma continued to contact him until Vaughan's cell number was disconnected in 2007, he never told Juma where the forms and the hardware could be found. Tr. Vol. 2 at 89-92, 117-18.

Supply sued Juma, Vaughan and Sam's Construction in 2006, in the Circuit Court for Cook County. The complaint did not contain an allegation that Juma had acted with malice. Pl. Ex. 2.

4

Vaughan hired Ian Erdos to represent the three defendants. Tr. Vol. 1 at 14-15. Erdos received copies of court pleadings until he withdrew from the case.

Supply filed an amended complaint. Pl. Ex 9 at Ex. A. Like the original complaint, it did not contain an allegation that Juma had acted with malice. The only mention of malice in the amended complaint is in the prayer for relief.

When Erdos withdrew, he told Juma that Juma "would get something in the mail, and I would have to file an answer to that." Tr. Vol. 1 at 17, lines 7-8. Although Erdos was no longer Juma's attorney, he walked Juma through the process of completing the answer to the amended complaint. Tr. Vol. 1 at 17-18.

Juma filed an appearance in the state court case on April 26, 2007, listing his address as 5927 South McVicker Street, Chicago, Illinois, the residence he has owned and lived in since 2003. Tr. Vol. 2 at 11; Pl. Ex. 7. When he filed his appearance, he also filed an answer to the amended complaint. Tr. Vol. 1 at 22-23. The answer was eventually stricken.

Supply filed a motion for summary judgment on June 8, noticing it for June 19, 2007. Pl. Ex. 9. Like the original and amended (except in the prayer for relief) complaints, the motion for summary judgment did not mention malice.

Juma does not remember whether he received a copy of Supply's summary judgment motion, but he did not respond to it. Tr. Vol. 1 at 31. He does not remember whether he saw the order granting that motion, or whether he made any inquiry at all into the status of the lawsuit. Tr. Vol. 1 at 27; Tr. Vol. 2 at 77. "It's just been so long I don't remember exactly. I received multiple documents, that's what I'm saying." Tr. Vol. 1 at 30, lines 23-25.

Although he filed the amended answer on his own, Juma never responded to the motion for summary judgment because he didn't have the funds to hire a lawyer. "I felt if I went to

5

court that the judge would tell me I would have to get a lawyer to represent me, so I just didn't have the funds to get anybody to represent me at that time. That's what I felt. If I went to court, that's what the outcome would have been." Tr. Vol. 1 at 32, lines 20-25.

In any event, Juma filed no response to the motion for summary judgment and did not appear in court when it was presented on June 19. The state court granted the motion. The handwritten order granting the motion for summary judgment includes the following paragraph:

> (c)    Judgment is entered against Sam Juma in the amounts of $80,335.08 and $46,340.59 (for the conversion of the construction forms) and the total judgment is $126,675.27. **The court enters a finding of malice** in regards to the conversion of the leased construction forms. Execution may issue on the judgment.

Pl. Ex. 11 (emphasis added). Supply's attorney prepared this order. Tr. Vol. 1 at 42.

## DISCUSSION

### Collateral Estoppel Does Not Preclude Juma From Relitigating the Issue of Malice

This court previously granted Juma's motion in limine and determined that collateral estoppel did not preclude him from relitigating the question of malice. Although the court ruled orally at the conclusion of the evidentiary hearing on the motion in limine, a written opinion in support of that ruling is appropriate in order to provide clarity to the record.

Collateral estoppel (issue preclusion) principles apply in adversary proceedings to except a debt from discharge. Grogan v. Garner, 498 U.S. 279, 284 n.11 (1991). "The effect of a judgment in subsequent litigation is determined by the law of the jurisdiction that rendered the judgment." In re Catt, 368 F. 3rd 789, 790-91 (7th Cir. 2004) (citations omitted). In our case, an Illinois state court rendered the judgment. Therefore, Illinois law determines the effect of the order granting the motion for summary judgment.

> First, the issue decided in the prior adjudication must be identical with the one presented in the suit in question. Second, there must have been a final judgment on the merits in the prior adjudication. Third, the party against whom estoppel is

asserted must have been a party or in privity with a party to the prior adjudication. Additionally, the party sought to be bound must actually have litigated the issue in the first suit and a decision on the issue must have been necessary to the judgment in the first litigation.

Am. Family Mut. Ins. Co. v. Savickas, 193 Ill. 2nd 378, 387 (Ill. 2000) (citations omitted).

The question presented here is whether the finding of malice in the state court order granting Supply's motion for summary judgment precludes Juma from relitigating the issue of malice in this adversary proceeding. The issue is identical; there was a final judgment; and the parties are the same. The remaining requirements to be satisfied for collateral estoppel to apply are whether Juma actually litigated the issue in state court, and whether a decision on the issue of malice was necessary to the judgment.

### **Juma Did Not Actually Litigate the Issue of Malice**

Did Juma actually litigate the issue of malice in state court? He testified that he does not remember whether he received Supply's motion for summary judgment. The court found him to be a credible witness. It is reasonable that more than seven years after the events in question he cannot recall whether the motion for summary judgment was one of many court papers that arrived in the mail. His testimony was not that he never received the motion, only that he cannot remember.

It is undisputed, however, that he did not oppose the motion for summary judgment. "Although Illinois law on the subject is neither well-developed nor clear, it appears Illinois subscribes to the majority view that a default judgment cannot form the basis for collateral estoppel." In re Nikitas, 326 B.R. 127, 131 (Bankr. N.D. Ill. 2005) (citation omitted). Since Juma did not oppose the motion for summary judgment, was the order granting the motion a default judgment? If it is, it cannot serve as the basis for issue preclusion.

Supply urged the court to find that the order granting the unopposed motion was not a default judgment. In support of its argument, Supply cited Cervac v. Littman, 517 B.R. 847, 860 (Bankr. N.D. Ill. 2014) (citations omitted) (emphasis added):

> There is a both a conceptual and practical difference between defaulting a party and ruling on an unopposed motion. Defaulting a party involves accepting as true uncontroverted allegations in a complaint, without further inquiry except perhaps by way of calculating judgment in a default judgment. Summary judgment, on the other hand, involves a critical inquiry of the court into the facts, **whether or not that summary judgment is opposed**.

Indeed, Juma presented an active defense in the state court case. Juma's attorney vacated a default judgment, filed a "reply to plaintiff's default motion considered as a motion for summary judgment," an affidavit in support of that reply and a motion to dismiss the amended complaint. Juma's attorney withdrew and Juma filed an appearance pro se. He then filed an answer to the amended complaint, but it was stricken. Supply moved for summary judgment, which was granted eleven days later.

Juma argued that it was clear he did not contest the allegations in the complaint once his counsel withdrew. He also attempts to distinguish Littman on the grounds that it does not address the "actually litigated" element of collateral estoppel, because it involved a decision under Fed. R. Civ. P. 59 and 60.

Littman is instructive on the narrow point for which Supply cites it, which is that a ruling on an unopposed motion for summary judgment is not the same as a ruling on a motion for default judgment. Nevertheless, it is crucial to consider the reason that in Illinois – and indeed in the majority of jurisdictions – a default judgment cannot form the basis for collateral estoppel. "This is so because by definition nothing is 'actually litigated' when a default is entered; the defendant loses because he fails to defend, not on the merits of the case itself." Nikitas, 326 B.R. at 131.

Similarly,

> [e]ntry of judgment on a motion for summary judgment satisfies the 'actually litigated' standard only if the party against whom judgment was entered had proper incentive to and did in fact fully contest the motion on the merits. When judgment is entered pursuant to an unopposed motion for summary judgment, as with most default judgments, the court has not heard evidence or contrary arguments. In that circumstance, the issues should not be considered to have been actually litigated even if the court required the plaintiff to go through a prove-up hearing, in the absence of some challenge to plaintiff's evidence.

In re Reyes, 2008 WL 2020501, *3 (Bankr. C.D. Ill. May 9, 2008) (citation omitted). See also In re Dvorak, 118 B.R. 619, 626 (Bankr. N.D. Ill. 1990) (Although "[j]udgment pursuant to an unopposed motion for summary judgment might well be more 'reliable' than a default judgment .... [w]hen judgment is entered pursuant to an unopposed motion for summary judgment, as with most default judgments, the court has not heard the arguments or evidence of the party against whom judgment was entered.").

In this case, there was no evidence submitted as to what occurred in state court on the day the summary judgment order was entered. Did the state court hear any arguments or hold any sort of prove-up hearing? We do not know.

"Detailed findings of fact from the earlier proceeding are necessary to enable the bankruptcy court to determine which issues were actually litigated in the earlier proceeding." In re Jacobs, 448 B.R. 453, 469 (Bankr. N.D. Ill. 2011) (quotation omitted). In Jacobs, the earlier judgment stated that "[t]his court expressly finds sufficient evidence of malice to warrant an entry of punitive damages as to both Defendants, jointly and severally." Id. The plaintiff sought to use that earlier judgment to collaterally estop a debtor-defendant from relitigating the issue of malice in a later § 523(a)(6) proceeding, exactly as Supply wishes to do here. Despite the fact that the "Supreme Court has held that punitive damages, in particular, are nondischargeable, and the circuit court made an explicit finding of malice with regard to the entry of those damages, the

9

**order provides no factual information whatsoever** and, in fact, does not expressly rule on any of the issues in the instant adversary proceeding." Id. at 470 (emphasis added). Thus the Jacobs bankruptcy judge gave no preclusive effect to the finding of malice in the state court judgment.

As this court noted at the hearing on the motion in limine,

> I have some real difficulty in my mind as to whether this really was actually litigated . . . and, ultimately, that's something that I believe is the burden of the person asserting collateral estoppel . . . [i]t's very hard to presume that the court had an opportunity to really look at all the exhibits and the things you said you presented. . . .
>
> I certainly don't know to what extent the court considered the evidence that was before it, but I have no evidence on that, and ultimately the burden of proof falls on you [Supply].

Tr. Vol. 1 at 44, lines 10-19; at 46, lines 14-17.

Having no evidence, aside from the order, regarding what occurred in state court on the day the summary judgment motion was granted, this court finds that even if the state court order at issue in this case is not a default judgment in form, it was so in substance. Treating this state court ruling on the unopposed motion for summary judgment as a default judgment also comports with the Seventh Circuit's "policy of favoring trial on the merits over default judgment." Cracco v. Vitran Exp., Inc., 559 F. 3rd 625, 631 (7th Cir. 2009). Therefore, the state court order does not satisfy the requirement that the issue of malice has been "actually litigated."

### The Finding of Malice was Not Necessary to the State Court Judgment

Even if this court determined that the order granting the motion for summary judgment satisfied the "actually litigated" requirement, one last requirement remains unfulfilled: Whether a decision on the issue of malice was <u>necessary</u> to the state court judgment. "An issue is necessary if it is required to reach a judgment in the first case." Gambino v. Koonce, 757 F. 3rd 604, 609-10 (7th Cir. 2014).

10

Is a finding of malice required to reach a judgment on a conversion count? The elements of conversion were described by the Illinois Supreme Court in Loman v. Freeman, 229 Ill. 2nd 104, 127 (Ill. 2008) (quotation omitted):

> To prove conversion, a plaintiff must establish that (1) he has a right to the property; (2) he has an absolute and unconditional right to the immediate possession of the property; (3) he made a demand for possession; and (4) the defendant wrongfully and without authorization assumed control, dominion or ownership over the property.

The Illinois Supreme Court makes no mention of malice. This is because "[a]lthough conversion is considered an intentional tort because it requires an intentional exercise of dominion or control over a chattel, **it does not require proof of malice**, culpability or conscious wrongdoing." Martel Enterprises v. City of Chicago, 223 Ill. App. 3rd 1028, 1032-33 (Ill. App. Ct. 1991) (citations omitted) (emphasis added).

However, "[t]he tort of conversion may support an award of punitive damages. An award of punitive damages is appropriate where the defendant acts willfully or with such gross negligence to indicate a wanton disregard of the rights of others." Reyes, 2008 WL 2020501, *4. Although "it is far from clear that willful and wanton under Illinois law mean the same thing as willful and malicious in Section 523(a)(6)," id., it comes closer to malice than a naked finding of conversion.

Supply itself admitted that "this matter [the state court litigation] does not address punitive damages." Response at 5. If no punitive damages were awarded in state court, then a finding of malice could not possibly have been necessary to the judgment. See Reyes, 2008 WL 2020501, *4 ("[b]ecause no punitive damages were awarded, the characterization in the judgment of [defendant's] conduct as willful and wanton was not necessary to the judgment and is surplusage.").

The Reyes court went on to comment in a footnote that

11

> There is no basis in the amended complaint, the supporting affidavit or elsewhere in the underlying state court record for any determination that [the defendant's] conduct, even accepting the facts of conversion, was willful, wanton, fraudulent or done with actual malice. The court presumes that [plaintiff's] state court attorney wrote out the order and that the judge made no such express findings as to [defendant's] conduct.

Id. at n.6. If a decision on the issue of malice was not necessary to the state court judgment – which it could not have been, because no punitive damages were awarded – then Juma cannot be precluded from relitigating it in a § 523(a)(6) action.

For all of these reasons, the court granted the motion in limine.[2] The finding of malice in the state court order did not preclude relitigation of the question of Juma's malice in this adversary proceeding.

### The Rooker-Feldman Doctrine Does Not Bar Relitigation of the Issue of Malice

At the January 29 trial on the merits of this proceeding, Supply's counsel argued that the Rooker-Feldman doctrine applied to bar relitigation of the question of malice.

This doctrine emerged from two Supreme Court cases, Rooker v. Fidelity Trust Co., 263 U.S. 413 (1923) and District of Columbia Court of Appeals v. Feldman, 460 U.S. 462 (1983). "It is a jurisdictional doctrine premised upon the fact that, because federal district courts are courts of original jurisdiction, lower federal courts are not authorized to review appeals from state court judgments . . ." Crestview Village Apartments v. U.S. Dept. of Housing and Urban Development, 383 F. 3rd 552, 556 (7th Cir. 2004). Only the United States Supreme Court may review a state court judgment.

The doctrine expanded over the years until 2005, when the Court decided Exxon Mobil Corp. v. Saudi Basic Indus. Corp., 544 U.S. 280 (2005). In Exxon, the Court reviewed Rooker

---

[2] Although the motion in limine was granted, Plaintiff's Exhibit 11 (the order granting the motion for summary judgment) is cited in the background section. This was necessary for purposes of resolving the motion in limine. The court did not rely on Plaintiff's Exhibit 11 for purposes of deciding the merits of this proceeding.

12

and Feldman and noted that each involved a "losing party in state court" who "filed suit in federal court after the state proceedings ended, complaining of an injury caused by the state-court judgment and seeking review and rejection of that judgment." Id. at 291. Only in these "limited circumstances," the Court said, will the doctrine apply. Id. The Rooker–Feldman doctrine "is confined to cases of the kind from which the doctrine acquired its name: cases brought by state-court losers complaining of injuries caused by state-court judgments rendered before the district court proceedings commenced and inviting district court review and rejection of those judgments." Id. at 284.

The Rooker-Feldman doctrine has no application here. Juma lost in state court, but he did not initiate an action in federal court complaining of injuries from that state court judgment. He is not asking this court to review or overturn the state court judgment. He simply seeks to be allowed to present evidence on the question of whether his debt to Supply was incurred through his willful and malicious actions. That request is reviewed under an issue preclusion analysis, as described above.

### **Supply Did Not Prove by a Preponderance of the Evidence that Juma's Debt was Incurred by Willful and Malicious Injury**

Having elaborated on the reasons why the motion in limine was granted, the court now turns to the merits of the proceeding. Did Supply meet its burden of proving by a preponderance of the evidence that Juma's debt was incurred by willful and malicious injury?

Creditors who seek a determination that their debt is nondischargeable under 11 U.S.C. § 523 bear the burden of proof. First Weber Group, Inc. v. Horsfall, 738 F. 3rd 767, 774 (7th Cir. 2013). They must prove each element of their § 523 claim by a preponderance of the evidence. Grogan, 498 U.S. at 287-88 (1991).

The subsection of § 523 under which Supply seeks a finding of nondischargeability is 11 U.S.C. § 523(a)(6):

> (a) A discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt....
>
> > (6) for willful and malicious injury by the debtor to another entity or to the property of another entity;....

The Seventh Circuit recently reviewed the elements that must be established in order to sustain a claim under 11 U.S.C. § 523(a)(6):

> The term "injury," while not defined in the Code, is understood to mean a "violation of another's legal right, for which the law provides a remedy." . . . .
>
> Willfulness requires "a deliberate or intentional *injury,* not merely a deliberate or intentional *act* that leads to injury." *Kawaauhau v. Geiger,* 523 U.S. 57, 61, 118 S.Ct. 974, 140 L.Ed.2d 90 (1998) (emphasis in original). Although *Geiger* refers to intentional torts to help explain the federal standard, it does not hold that all state-law intentional torts are "willful" for purposes of section 523(a)(6). *See Jendusa-Nicolai,* 677 F.3d at 322 ("[A]n intentional tort needn't involve an intent to cause injury."). "Willfulness" can be found either if the "debtor's motive was to inflict the injury, or the debtor's act was substantially certain to result in injury."
>
> Lastly there is maliciousness, which requires that the debtor acted "in conscious disregard of [his] duties or without just cause or excuse; it does not require ill-will or specific intent to do harm." *Matter of Thirtyacre,* 36 F.3d 697, 700 (7th Cir.1994) (citation omitted). We recently commented that we had not had the occasion to revisit the *Thirtyacre* definition since the Supreme Court's decision in *Geiger.* Understanding that the definition of willfulness must incorporate *Geiger's* admonition that the requisite intent for purposes of § 523(a)(6) is the intent to injure rather than the intent to act, we reaffirm today that our definition of maliciousness from *Thirtyacre* remains good law.

Horsfall, 738 F. 3rd 767, 774-75 (7th Cir. 2013) (some citations and quotations omitted).

Supply suffered an injury. The evidence is clear that that concrete forms were delivered but never returned. Its legal rights were violated, and the law provided a remedy – a money judgment was entered against Juma on Supply's claim of conversion.

### Juma Did Not Act Willfully When He Incurred the Debt to Supply

Did Juma act willfully when he incurred the debt to Supply? The court had the opportunity to judge Juma's demeanor on the witness stand on two occasions, and found him to be quite credible. His uncontroverted testimony was that in the partnership with Vaughan, he was responsible for the financing and Vaughan took care of the construction. Juma admitted filling out the credit application – there is no dispute that he owes money to Supply – but repeatedly insisted that he had nothing else to do with the concrete forms. When he filled out that credit application, he neither knew nor understood that the purpose was to obtain concrete forms. He gave the application to Vaughan, and later some invoices were mailed to him, but until he started receiving calls "about debts owed and the forms needed to be returned," Juma never read those invoices. "I did not have a clue that I needed forms. I didn't even know what forms are, sir."

At closing arguments, Supply's counsel asserted that the fact that Juma knew he had no authority to dispose of the forms, and that he knew the value of the forms, constituted willfulness.

The court is at a loss to see how this constitutes willfulness. There was absolutely no evidence introduced to suggest that Juma's motive was to inflict injury on Supply, or that his actions were substantially certain to result in injury. What did Juma do once he realized that the forms had been delivered to the construction site, used by Vaughan, and never returned? He called Vaughan several times, even meeting with him face to face, in attempts to get the forms returned to their rightful owner. Vaughan repeatedly assured Juma that he would take care of the situation. How were these actions "substantially certain to result in injury?" While Juma

15

eventually realized that Vaughan was leading him on, his continued attempts to find the forms are the very opposite of an intent to injure Supply.

Of course Supply is frustrated that its forms were never returned, that it lent equipment in good faith and was taken advantage of. Supply expects the court to find that Juma acted willfully because the forms were delivered to his property and then disappeared. But the theory of res ipsa loquitur does not apply in a § 523(a)(6) proceeding. A creditor who seeks a finding that its debt is nondischargeable because it was incurred through willful and malicious injury must show that the debtor's motive was to inflict an injury, or that his act was substantially certain to result in injury. Supply failed to show that Juma had any intent to injure, or that his actions were taken with the knowledge that Supply was substantially certain to be injured. Without that showing, the debt is dischargeable.

### Juma Did Not Act Maliciously When He Incurred the Debt to Supply

Although Supply failed to show that Juma acted willfully, the court will address the question of malice as well. As quoted above, the Seventh Circuit recently reiterated its definition of maliciousness as acting "in conscious disregard of [his] duties or without just cause or excuse; it does not require ill-will or specific intent to do harm." Horsfall, 738 F.3rd at 774.

At closing arguments, Supply's counsel argued that "[y]ou're charged with the responsibility and he acknowledged the responsibility and disregarded it. That's malice." Tr. Vol. 2 at 122, line 25 – page 123, line 2.

This argument is not supported by the evidence adduced at trial. None of the evidence suggests that Juma consciously disregarded his duties and responsibilities. When representatives from Supply started calling Juma, demanding that the rental forms and other equipment be returned, he took steps to remedy the situation. Supply tries to find a conscious disregard of his

duties in Juma's lack of a written response to the demand letter, but Juma testified that "I was trying to resolve it between me and my partner and get the forms back to R&J Construction." Failing to respond in writing to the demand letter does not constitute admission of the allegations in that letter.

The court found very credible Juma's testimony that he asked Vaughan "multiple times" what happened to the forms, and that the older, more experienced Vaughan repeatedly told Juma that he would "take care of it."

> Q: How did you follow up or did you follow up?
>
> A: I did follow up, phone calls. I tried to set up a meeting with him [Vaughan] to talk to him in person face to face, and I was successful a couple of times. But every time was I'll take care of it, I'll take care of it, and –
>
> Q: And it was never taken care of?
>
> A: No, it was not.

Juma even continued to call Vaughan after Vaughan left for Ireland, hoping to get a location for the forms so he could tell Supply where to pick them up. "I tried to get a location. I couldn't. I wasn't able to obtain a location to be able to pin them and to be able to call R&J Construction Company to come out." Juma's credible and uncontroverted testimony does not support a finding of malice.

## CONCLUSION

For all of the reasons stated above, the court finds that Juma did not act willfully and did not act maliciously in injuring Supply. Therefore, Supply did not prove by a preponderance of the evidence that Juma's debt was incurred by willful and malicious injury. Juma's debt to Supply will be discharged.

Date: 30 APR 2015

_____
PAMELA S. HOLLIS
United States Bankruptcy Judge